FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

FRED TAYLOR ISQUITH
isquith@whafh.com
THEODORE B. BELL
tbell@whafh.com
CARL MALMSTROM
malmstrom@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
55 West Monroe Street, Suite 1111
Chicago, IL 60603

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIRLEY SCHROEDER and CONSTANCE WERTHE, On Their Own Behalves And On Behalf Of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC. and KEURIG, INC.,<br><br>        Defendants. | Civil No.  '14CV0678 DMS KSC<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT

Plaintiffs Constance Werthe and Shirley Schroeder ("Plaintiffs") for their complaint, allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## NATURE OF ACTION

1.      This is an antitrust class action brought against Defendants Keurig Green Mountain, Inc. ("KGM") and Keurig, Inc. ("Keurig"), KGM's wholly-owned subsidiary (collectively, "Green Mountain" or "Defendants") pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and California state antitrust and unfair competition statutes. This action is brought by Plaintiffs, on behalf of themselves and of Class of persons and entities who indirectly purchased from any Defendant or current or former subsidiary or affiliate, K-Cups during the period from and including September 2012 through such time as the anticompetitive effects of Defendants' conduct ceases (the "Class Period").

2.      Green Mountain has monopolized the market for the sale of single-serve brewers, as well as the market for the sale of single servings or "portion packs" of coffees or other beverages that are used in those brewers. Green Mountain previously owned certain patents that allowed it to exclude competition for the sale of the most popular format of those "portion packs" — the "K-Cup" format.  Those patents expired in 2012.

3.      Rather than compete for market share on the merits or fulfill its statutory obligation to enable competitors to practice its invention after its patents expired, Green Mountain has abused its dominance in the brewer market by coercing business partners at every level of the K-Cup distribution system to enter into anticompetitive agreements intended to unlawfully maintain Green Mountain's monopoly over the markets in which K-Cups are sold. Even in the face of these exclusionary agreements that have unreasonably restrained competition, some companies, including TreeHouse Foods, Inc. ("TreeHouse"), have sought to win

CLASS ACTION COMPLAINT

market share away from Green Mountain by offering innovative, quality products at substantially lower prices.

4.      In response, Green Mountain has announced a new anticompetitive plan to maintain its monopoly by redesigning its brewers to lock out competitors' products. Such lock-out technology cannot be justified based on any purported consumer benefit, and Green Mountain itself has admitted that the lock-out technology is not essential for the new brewers' function. Like its exclusionary agreements, this lock-out technology is intended to serve anticompetitive and unlawful ends. Indeed, such an anticompetitive product redesign would force consumers such as Plaintiffs to pay at least 15% to 25% more for K-Cups, would block consumers such as Plaintiffs from their preferred beverages, and would restrain competition on the merits.

5.      Green Mountain's market dominance is clear. To this day, Green Mountain controls: (1) approximately 89% of the market for the sale of single-serve brewer machines; (2) at least 73% of the market for the sale of all portion packs used in single-serve brewers; and, (3) according to Green Mountain's CEO on a February 5, 2014 investor call, 86% of the market for cups compatible with its own brewers.

6.      As Green Mountain CEO Brian Kelley further acknowledged, for many years, Green Mountain controlled 100% of the market for the sale of these cups, which are used in brewers to prepare a single serving of coffee, tea, hot chocolate, cider, or other beverages. Although competitors have entered the market, Green Mountain continues to sell K-Cups at supracompetitive prices for use with single-serve brewers manufactured or licensed for manufacture by Keurig to be compatible with K-Cups ("K-Cup Brewers").

7.      KGM first partnered with Keurig in the late 1990s to manufacture and sell K-Cups, which, at that time, were covered by patents relating to the coffee filters in those cups ("K-Cup Filter Patents").

8.      Threatened by the inevitable expiration of the K-Cup Filter Patents that

CLASS ACTION COMPLAINT

- 2 -

would occur in 2012, KGM embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of competitive portion packs that, just like K-Cups, would be compatible with K-Cup Brewers, but that would be engineered, manufactured, and sold by unaffiliated competitors seeking to introduce new products to consumers at lower prices ("Competitive Cups" or, collectively with K-Cups, "Compatible Cups").

9.     After acquiring Keurig and its patents in 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. ("Van Houtte"), all before the end of 2010. However, Green Mountain did not stop there.

10.    To monopolize through the foreclosure of potential competition, Green Mountain proceeded systematically to tie up vertical distribution channels for Competitive Cups by entering into unduly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system; the sellers of machinery used to make Compatible Cups; their foil tops; makers of coffee that could fill a competing cup; and distributors and retailers that sell and market Compatible Cups. The terms and number of these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

11.    For example, Green Mountain does not restrict the ability to sell these same products for other purposes — *just so long as those products are not sold to a Green Mountain competitor who intends to use them to make cups for use in K-Cup Brewers.*

12.    Moreover, Green Mountain's exclusionary agreements with coffee brands also contain restrictions dictating where and how licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output. This creates a further incentive for

CLASS ACTION COMPLAINT

licensed coffee brands to conspire to exclude Competitive Cup makers from the market unless those competitors agree to take a license or become "authorized" by Green Mountain, thereby likewise subjecting the Competitive Cup makers to Green Mountain's territorial control and allocation.

13.    Green Mountain distributors, which, according to Green Mountain, exceed 500 in number, are also prohibited from dealing with Competitive Cup makers under the express terms of Green Mountain's Keurig Authorized Distributor (or "KAD") Agreement.

14.    Having grown into a billion-dollar publicly traded company by restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that — raising its K-Cup prices 10% to 15% in the fourth quarter of 2010.

15.    The web of exclusive dealing agreements Green Mountain has created allows it to leverage its monopoly over K-Cup Brewers in order to maintain its monopoly over the portion pack market, and indeed, this was the intended result of Green Mountain's business model: the profitability of which depends upon Green Mountain's ability to maintain supracompetitive K-Cup prices and to restrain competition from lower-priced Competitive Cups.

16.    Green Mountain sells K-Cup Brewers at cost or even at a loss for use by consumers and provides K-Cup Brewers to businesses for free, so long as those businesses agree to purchase K-Cups exclusively from Green Mountain.

17.    While Green Mountain sacrifices brewer profits to drive K-Cup sales, it recoups profits by charging a 50% margin on K-Cups. Green Mountain admits, for instance, that it "sell [s] [] at home ('AH') brewers at attractive price points which are ... sometimes at a loss ... in order to drive the sales of profitable packs." (Green Mountain Coffee Roasters, Inc., Form 10-Q, "For the thirteen weeks ended December 28, 2013").

CLASS ACTION COMPLAINT

- 4 -

18.   Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain such a substantial K-Cup profit margin for as long as it has following the entry of Competitive Cup makers.

19.   Competitive Cups first entered the market in 2010, made by Green Mountain competitor TreeHouse Foods, Inc. and its subsidiary Sturm Foods Inc. Keurig sued TreeHouse Foods, Inc.'s subsidiary, Sturm Foods, Inc. ("Sturm"), alleging that the sale of these Competitive Cups to consumers infringed and induced infringement of Keurig's *brewer* method patents — not even asserting any patents covering K-Cups themselves.  Keurig's lawsuit was dismissed by the District Court, and the dismissal affirmed by the Federal Circuit, which admonished Keurig, holding that it was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.,* 732 F.3d 1370, 1374 (Fed. Cir. 2013).

20.   The Federal Circuit expressly concluded, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.* The litigation, accordingly, was not for a proper purpose, but only to restrain competition.

21.   When Green Mountain's K-Cup Filter Patents expired, TreeHouse and others began selling Competitive Cups, with and without filters, in competition with Green Mountain. Although some competitors were able to enter the market, their ability to increase capacity and to bring Competitive Cups to consumers and businesses has been restrained by anticompetitive exclusive dealing agreements that have restricted access to cup-making machinery, cup components, coffee brands, and virtually entire categories of potential TreeHouse customers, like the highly profitable Office Coffee Services business. These exclusive dealing agreements are anticompetitive because, among other reasons, they have facilitated

CLASS ACTION COMPLAINT

Green Mountain's exercise of market power by impairing rivals' abilities to achieve the scale necessary to become competitively efficient and by depriving TreeHouse of efficient access to both upstream and downstream markets.

22. Consumers who purchase Compatible Cups are highly price-sensitive. Not surprisingly, demand has been growing for Competitive Cups, which are typically sold at prices that are at least 15% to 25% lower than prices for K-Cups.

23. Recognizing that with price-sensitive customers the presence of effective competition in the Compatible Cups market would erode the 50% profit margin Keurig enjoys, Defendants have announced a new technological plan to thwart this competition. Keurig will stop selling existing K-Cup Brewers and will replace them with a new K-Cup Brewer called the Keurig 2.0 ("2.0 K-Cup Brewer"). The new 2.0 K-Cup Brewers will be able to identify whether an inserted Compatible Cup is Defendant-supplied or licensed K-Cup ("2.0 K-Cups") or a Competitive Cup, in order to prevent the brewer from working with Competitive Cups. Green Mountain has not articulated any consumer benefit from programming its 2.0 K-Cup Brewers to be able to reject Competitive Cups. Indeed, Mr. Kelley has admitted that the proposed lock-out technology could be programmed by Green Mountain to be switched on or off after a certain number of uses, thus demonstrating that this technology cannot plausibly be considered to be integral or key to any consumer benefit offered by the new product.

24. Defendants then systematically informed retail customers of at least some of the Competitive Cup makers that its 2.0 K-Cup Brewers would lock out those competing brands, and encouraged these retail outlets to cease doing business with the Competitive Cup maker. In short, Green Mountain has committed numerous anticompetitive acts to unlawfully maintain its monopoly over the portion pack and Compatible Cup markets, including:

- Using unduly restrictive, anticompetitive, and unjustifiable exclusionary

CLASS ACTION COMPLAINT

agreements to make machine manufacturers and component suppliers unavailable to competing makers of Compatible Cups;

- Establishing agreements with coffee roasters and coffee brands to allocate markets, reduce output, and to restrain competition from substantially lower-priced Competitive Cups, thereby maintaining supracompetitive prices and inducing would-be competitors to enter into an agreement with Green Mountain despite the expiration of its K-Cup Filter Patents;

- Locking distributors and retailers into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to retail customers and distribution channels;

- Filing sham litigation and continuing on appeal to sap the resources of makers of Competitive Cups;

- Threatening to eliminate competitive access to 2.0 K-Cup Brewers, as well as retail customer and consumer choice, by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups, even though K-Cup Brewers and Compatible Cups are distinct products that consumers demand to purchase separately and that have been purchased separately for years; and

- Using its plan to technologically tie its 2.0 K-Cup Brewers to its licensed cups to encouraged retail outlets to cease doing business with the makers of Competitive Cups.

25.    Green Mountain's conduct violates both Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act, and California state antitrust and unfair competition statutes.

26.    These efforts, individually and collectively, were intended to, and have had the effect of, substantially foreclosing competition, restricting entry, constraining output, maintaining supracompetitive prices, restraining the free and fair interplay of the market, and curtailing consumer choices.

CLASS ACTION COMPLAINT

27.   As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Class paid artificially inflated prices for K-Cups purchased during the Class Period, and have thereby suffered antitrust injury to their business or property.

## PARTIES

**Plaintiffs**

28.   Plaintiff Constance Werthe is domiciled in the County of Orange in the State of California and purchased K-Cups indirectly from one or more Defendants during the Class Period.

29.   Plaintiff Shirley Schroeder is domiciled in the County of San Diego in the State of California and purchased K-Cups indirectly from one or more Defendants during the Class Period.

**Defendants**

30.   Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.

31.   Defendant Keurig, Inc., is a corporation organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts. Keurig is a wholly-owned subsidiary of KGM.

## AGENTS AND CO-CONSPIRATORS

32.   Various persons that are not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged conspiracy to monopolize the markets for the sale of portion packs and Compatible Cups and the anticompetitive and unduly restrictive exclusive dealing agreements addressed in this lawsuit. Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.

CLASS ACTION COMPLAINT

1     33.    On information and belief, other corporations, partnerships, or business

2 entities, currently unknown to Plaintiffs, are co-conspirators with Defendants in their

3 unlawful restraints of trade.

4 **JURISDICTION AND VENUE**

5     34.    This Court has federal question jurisdiction pursuant to the Sherman

6 Act, 15 U.S.C. §§ 1-7, the Clayton Act, 15 U.S.C. §§ 15, 26; 28 U.S.C. §§ 1331,

7 1337; and it has supplemental jurisdiction over the California state law claims

8 pursuant to 28 U.S.C. § 1367.

9     35.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)

10 because sufficient diversity of citizenship exists between parties in this action, the

11 aggregate amount in controversy exceeds $5,000,000, and there are 100 or more

12 Class members.

13     36.    Venue is proper in this district pursuant to Section 12 of the Clayton

14 Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b)-(d), because a substantial part of the

15 events giving rise to Plaintiffs' claims occurred in this District, a substantial portion

16 of the affected interstate trade and commerce discussed below has been carried out in

17 this District, and one or more of the Defendants, are licensed to do business in, are

18 doing business in, had agents in, or are found or transact business in California and

19 this District.

20     37.    This Court has *in personam* jurisdiction over the Defendants because

21 each, either directly or through the ownership and/or control of its subsidiaries, *inter*

22 *alia*: transacted business in the United States, including in this District; directly or

23 indirectly sold or marketed K-Cups throughout California, including in this District;

24 had substantial aggregate contacts with the United States as a whole, including in this

25 District; or were engaged in anticompetitive conduct that was directed at, and had a

26 direct, substantial, reasonably foreseeable and intended effect of causing injury to,

27 the business or property of persons and entities residing in, located in, or doing

28 business throughout California, including in this District. Defendants also conduct

CLASS ACTION COMPLAINT

business in California, including in this District, and they have purposefully availed themselves of the laws of the United States.

38.   Defendants' unlawful conduct described herein adversely affected persons and entities in California who purchased K-Cups, including Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

39.   Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), seeking damages, equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities who resided in the State of California who indirectly purchased, from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, K-Cups during the Class Period.

40.   Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased K-Cups directly.

41.   The Class is so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of the members of the Class, Plaintiffs believe there are (at least) thousands of members in the Class.

42.   Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

> (a)   Whether the Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of K-Cups sold in the United States;

CLASS ACTION COMPLAINT

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether Defendants had monopoly power in the relevant markets;

(e)     Whether Defendants engaged in anticompetitive conduct in order to maintain the monopoly in the relevant markets;

(f)     Whether Defendants' alleged conduct violated the Sherman and Clayton Acts;

(g)     Whether Defendants' alleged conduct violated California state statutes;

(h)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(i)     The effect of Defendants' alleged conduct on the prices of K-Cups sold in the United States during the Class Period;

(j)     The appropriate relief for the Class.

43.    Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for K-Cups purchased indirectly from the Defendants and/or their co-conspirators.

44.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

45.    The questions of law and fact common to the members of the Class

CLASS ACTION COMPLAINT

predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

46.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

47.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## RELEVANT MARKETS

### A.     Relevant Product Markets

48.     There are at least three relevant product markets in which to evaluate Defendants' anticompetitive conduct: (1) the market for the design, manufacture, and sale of single-serve brewers ("Single-Serve Brewer Market"); (2) the market for the design, manufacture, and sale of "portion packs" or single-serve containers of coffee, tea, or other beverages ("Portion Packs") that are used in single-serve brewers ("Portion Pack Market"); and (3) the market for the design, manufacture, and sale of Compatible Cups (the "Compatible Cup Market"), which is a sub-market of the Portion Pack Market. Green Mountain tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes. *See* Green Mountain FQ 1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014).

#### 1.     Single-Serve Brewer Market

49.     The Single-Serve Brewer Market encompasses the design, manufacture,

CLASS ACTION COMPLAINT

and sale of single-serve brewers. The single-serve brewer is a quick, convenient, and simple way for consumers to brew a single cup of coffee, cocoa, cappuccino, cider, or other beverages ("Single-Serve Brewer"). Single-Serve Brewers brew coffee in less than a minute without requiring the consumer to grind beans, measure coffee, handle used filters, or clean up after the coffee is prepared.

50.     In part because of the unique convenience offered by Single-Serve Brewers, the price of traditional drip coffee makers typically does not fully constrain prices for Single-Serve Brewers.

51.     Consumers pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers. While traditional drip coffee makers are frequently sold around a price point of $20 to $30, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars.

### a.     Keurig Single-Serve Brewers

52.     Green Mountain designs, manufactures, and sells a variety of Single-Serve Brewers under the brand name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo Brewers, each of which uses a different type of Portion Pack that is incompatible with the other types of brewers.

53.     Keurig offers a variety of Single-Serve K-Cup Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector *(e.g.,* hotels).

54.     K-Cup Brewers are sold for a range of prices. For example, the Mr. Coffee KG2 brewer for home use has been priced at $89.95, while the Breville brewer for home use has been priced at $249.95. Keurig's website lists the prices of only two of its commercial brewers, which are either $129.95 or $249.95.

55.     While K-Cups and K-Cup Brewers are sold as separate products in many stores and online, Keurig typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.

56.     Green Mountain restricts the ability of distributors to advertise or

CLASS ACTION COMPLAINT

display the prices of K-Cups that are used in office K-Cup Brewers. For example, contractual provisions provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack [ ] through or at any store operated by or for Distributor." KAD Agreement § 2.1.

57.     In addition to the Single-Serve Brewers manufactured by Green Mountain, Green Mountain also licenses K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville, among others.

58.     Keurig also sells Vue Brewers, which, like K-Cup Brewers, are marketed for home or office use. Vue Brewers, however, use a different type of Portion Pack, known as "Vue Cups," which are shaped differently than K-Cups. The Vue Brewer is not compatible with K-Cups, and Vue Cups cannot be used in K-Cup Brewers or Rivo Brewers.

59.     Keurig also offers the Rivo cappuccino and latte brewer.  This brewer "exclusively uses Rivo Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers. K-Cups thus cannot be used in Rivo brewers.

60.     More than half of the Keurig K-Cup Brewers, in both the home and commercial sectors, already offer consumers more than one brew size and a digital display.

### b.     Single-Serve Brewers Manufactured By Other Companies

61.     Additional Single-Serve Brewers besides Green Mountain's Keurig brewers include Mars, Inc.'s "Flavia;" Bosch's "Tassimo;" Philips Electronics N.V.'s "Senseo;" Nestle's "Nespresso;" and Starbucks' "Verismo."

62.     Prices across these Single-Serve Brewers can vary by as much as several hundred dollars.   These Single-Serve Brewers are fragmented and collectively represent a small share of the Single-Serve Brewer Market.

CLASS ACTION COMPLAINT

c.     **Green Mountain Has Monopoly Power In The Single-Serve Brewer Market**

63.    Green Mountain controls the dominant share of the Single-Serve Brewer Market. As brokerage and investment firm Stifel has noted, Green Mountain's brewer market share is so "dominant" that it is "unlikely any new entrant could gain meaningful share." A 2011 Morgan Stanley consumer survey report similarly observed, "Green Mountain and its Keurig system dominates [the single-serve brewer market]." (*TreeHouse Foods, Inc., v. Green Mountain Coffee Roasters, Inc.*, No. 1:14-cv-905 (D. Del.), filed Feb. 11, 2014, hereafter "*TreeHouse* Complaint," at ¶65.)   Green Mountain reported in September 2013 that it had sold over 30 million Keurig Single-Serve Brewers, which are used in at least approximately 15 million U.S. households. In fiscal year 2013 alone, Green Mountain sold approximately 10.6 million Keurig Single-Serve Brewers.

64.    As of September 2013, Keurig Single-Serve Brewers represented the top four best-selling coffeemakers in the United States by dollar volume.

65.    From July 2012 to July 2013, Green Mountain sold approximately 4.8 million Single-Serve Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% by dollar value. According to a 2013 market report, Green Mountain controls at least 88% of the Single-Serve Brewer Market of brewers used in the home, and on information and belief, Green Mountain controls nearly 100% of the share of K-Cup Brewers supplied to offices.

66.    In the first quarter of 2014, Green Mountain sold a record 5.1 million Keurig Single-Serve Brewers.

67.    Green Mountain has the power to exclude competition in the Single-Serve Brewer Market. Green Mountain has exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retailers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

CLASS ACTION COMPLAINT

68.     Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market. For example, Green Mountain still holds patents that cover its K-Cup Brewers.   Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment. Moreover, because retailers are reluctant to stock brewers unless the Portion Packs they use are readily and widely available, and Portion Packs that are compatible with any particular brewer are not widely available unless the corresponding brewers are popular, potential market entrants face a substantial competitive disadvantage vis-a-vis established brewer suppliers.

### 2.     The Portion Pack Market

69.     The second relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Portion Packs that are used in Single-Serve Brewers.

70.     Compatible Cups (both K-Cups and Competitive Cups) are Portion Packs that are generally only used in Single-Serve Brewers that are K-Cup Brewers.

71.     Some Single-Serve Brewers besides K-Cup Brewers instead use Portion Packs that are packaged as "pods," which look like flat cookies, or "T-Discs", which are a type of sealed pod.

72.     Manufacturers of Single-Serve Brewers that use "pod" Portion Packs include Hamilton Beach, Gevalia, and Philips Electronics N.V.'s "Senseo."

73.     Bosch's "Tassimo" brewer uses "T-Disc" Portion Packs.

74.     The ability to increase Portion Pack prices above their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers. The price-per pound of Portion Pack coffee is nearly five times greater than that of ground coffee. This has been the case because consumers who utilize Single-Serve Brewers and compatible Portion Packs generally find such packs to be substantially more convenient and desirable in their quality as compared with the brewed coffee from multiple-serve formats. Thus, were single-serve Portion Packs

CLASS ACTION COMPLAINT

competitively priced, consumers who own a Single-Serve Brewer would generally not substitute away from its use in favor of multi-serve formats in reaction to a small but significant rise in the price for the corresponding single Portion Packs.

75.    Although there are different types of Portion Packs, such as K-Cups, T-Discs, and pods, each of these Portion Packs is generally only compatible with a corresponding type of Single-Serve Brewer. For example, Compatible Cups generally only work in K-Cup Brewers and T-Discs generally only work in the Tassimo brand of Single-Serve Brewers.

76.    Once a consumer purchases a K-Cup Brewer, that consumer cannot use other types of Portion Packs, such as T-Discs or pods, in the K-Cup Brewer, and thus consumers do not view T-Discs or pods as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers. Indeed, these other Portion Packs are generally incompatible with K-Cup Brewers.

77.    Green Mountain possesses and exercises monopoly power over the Portion Pack market. Green Mountain controls approximately 73% of the Portion Pack Market. Green Mountain touts its K-Cups as the "#1 single cup brand."

78.    Barriers to entry are high and challenging for potential entrants into the Portion Pack Market. Potential manufacturers must either develop and manufacture their own brewers to be compatible with their own Portion Packs, or, alternatively, make Portion Packs that are compatible with Green Mountain's K-Cup Brewers or another existing Single-Serve Brewer (*e.g.,* pods or T-Discs).

79.    In the first instance, potential entrants to the market cannot easily manufacture their own brewers to accommodate their own Portion Packs because Green Mountain has a number of patents covering brewer technology. Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

80.    In the second instance, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell

CLASS ACTION COMPLAINT

a Portion Pack that is compatible with a particular Single-Serve Brewer format.

81.     Potential entrants are further restrained from entering the Portion Pack Market because Green Mountain has entered into exclusionary agreements with suppliers of the machinery and components used to make Portion Packs. These agreements have restricted the ability of competitors to purchase machinery and inputs needed to compete on a level playing field with Green Mountain in the Portion Pack Market.

82.     Green Mountain intends to further increase its monopoly power by launching the 2.0 K-Cup Brewer, which will reportedly contain "interactive technology" preventing 2.0 K-Cup Brewers from functioning with Competitive Cups, and by replacing all existing K-Cup Brewers sold by Green Mountain with the 2.0 K-Cup Brewer.

### 3.     The Compatible Cup Market

83.     The third relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups that are: (1) either compatible with K-Cup Brewers; or (2) would be compatible with K-Cup Brewers, but for the proposed "interactive technology" designed to prevent Competitive Cups from working in 2.0 K-Cup Brewers. The Compatible Cup Market is a sub-market of the Portion Pack Market.

84.     Green Mountain has itself acknowledged, in statements to the public and investors, that the Compatible Cup Market is distinct from the Portion Pack Market, inasmuch as Portion Packs that are incompatible with the K-Cup format do not offer much significant competition to compatible ones.

85.     Indeed, the Compatible Cup Market, as opposed to the Portion Pack Market, is the market in which Green Mountain tracks market shares of K-Cups for competitive purposes. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15.

86.     As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high. The New York Times has noted that "Folgers [K-Cups],

CLASS ACTION COMPLAINT

with 8 grams per capsule, work[] out to more than $50 a pound", which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs." (http://www.nytimes.com/2012/02/08/dining/ single-serve-coffee-brewers-make-convenience-costly.html (last visited March 24, 2014)).

87.    Yet, as Time Magazine pointed out, "[t]he [cup] numbers are highly variable based on where one shops, what kind of coffee you're buying, and whether you purchase in small packages or enormous quantities." ("Beans vs. Single-Serve Cup: Just How Much More Does K-Cup Coffee Cost?" *Time*, Feb. 9, 2012        (http://business.time.com/2012/02/09/beans-vs-single-serve-cup-just-how-much-more-does-k-cup-coffee-cost/ (last visited March 24, 2014)).

88.    Competitive Cup companies, exercising their right to produce Competitive Cups, offer prices that are substantially lower than Keurig-branded K-Cups; and, hence, appeal to large numbers of price-conscious consumers.

89.    Competitive Cups, such as those produced by TreeHouse, are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Green Mountain. *See, e.g.,* Green Mountain FQ1 2014 Earnings Call Tr. at 15 (Green Mountain admitting that Competitive Cups "came in at mostly 15 to 25% lower prices"). Specifically, on average, the price per K-Cup is approximately $0.60 as opposed to Competitive Cups, which are sold at about $0.45. *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28 (October 4, 2013).

90.    Green Mountain owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. ("Van Houtte").

91.    Green Mountain also licenses the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks. Green Mountain either owns or licenses some forty-nine brands.

CLASS ACTION COMPLAINT

92.    In total, Green Mountain controls approximately 86% of the Compatible Cup Market, as Green Mountain's President and Chief Executive Officer, Brian Kelley, recently admitted during a conference call with financial analysts on February 5, 2014. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15 ("We had 100% of the system ... and all of a sudden we have 86% ...."); *see also* Citi Report, DD's K-Cup Corner v8.13 at 2 (July 18, 2013) (noting Green Mountain controlled 92% of the K-Cup market in 2013).

93.    The remaining 14% of the Compatible Cup Market is composed of sellers, like TreeHouse, of unlicensed and private label Competitive Cups that are compatible with K-Cup Brewers. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 6 (Green Mountain "estimate[s] that unlicensed packs represented a 14% share of the Keurig system as of the end of [their] first quarter" of 2014.).

94.    In fiscal year 2012, Green Mountain's net sales were $3.9 billion. 90% of these consolidated net sales resulted from the combined sales of K-Cup Brewers (which comprised 22%, or $760 million) and K-Cups (which comprised 78%, or $2.7 billion). This is consistent with Green Mountain's strategy of selling its K-Cup Brewers at cost or at a loss.

95.    In fiscal year 2013, Green Mountain's net sales included approximately $3.187 billion for K-Cups and approximately $828 million for K-Cup Brewers.

96.    As discussed further above, Compatible Cups designed for use in K-Cup Brewers are not reasonably interchangeable with other Portion Pack formats, such as T-Discs, pods, or capsules. Consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups. *See* ¶ 75, *supra*.

97.    Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Green Mountain locks consumers in to use the Compatible Cup format by selling its K-Cup Brewers at cost or at a loss and is able to recoup and

CLASS ACTION COMPLAINT

greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups. *See* Green Mountain Investor Day Presentation at 164 (September 10, 2013).

98.   Indeed, Green Mountain has been able to exercise its monopoly power by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share or increasing demand for Portion Packs other than Compatible Cups or Single-Serve Brewers other than K-Cup Brewers.

99.   Green Mountain has also exercised, sustained, and magnified its monopoly power over the Compatible Cup Market by excluding competitors from accessing machinery, inputs, distributors, and retailers that are needed to compete on a level playing field with Green Mountain.

100.   For example, Green Mountain has succeeded in substantially foreclosing TreeHouse's access to the market for the sale of Compatible Cups to offices and has substantially restrained competition for Compatible Cup sales to consumers for home use.

101.   Barriers to entry for the Compatible Cup Market are high and difficult to surmount for the same reasons discussed above with respect to the Portion Pack Market.

102.   Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer. The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked-in to its use to find it impractical to substitute to Portion Packs that are incompatible. The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Cups. TreeHouse, for example, bases the price for Competitive Cups on the price of K-Cups, but not on the price of T-Discs, pods, or other Portion

CLASS ACTION COMPLAINT

Packs that are incompatible with K-Cup Brewers. In general, TreeHouse seeks to price its Competitive Cups at least 15% to 25% lower than K-Cups.

   **a.**   **The At-Home Market Segment**

103.   The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use at home in their K-Cup Brewers ("At-Home Market Segment") and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

104.   The At-Home Market Segment is a billion dollar market.

105.   At least approximately 15 million U.S. households have a K-Cup Brewer for use at home.

106.   Green Mountain controls approximately 92% of the At-Home Market Segment for Compatible Cups. Competitive Cup manufacturers hold the remaining 8% of that market segment. *See* Green Mountain Investor Day Presentation at 98-99 (September 10, 2013).

   **b.**   **The Away-From-Home and Office Coffee Services Market Segments**

107.   K-Cups are also consumed outside of consumers' homes at, among other places, food service, workplace, higher education, and hospitality locations.

108.   The Away-From-Home Market Segment is a $600 million to one billion dollar market.

109.   Since at least 2009, Green Mountain has been the Portion Pack leader in the Away-From-Home Market Segment.

110.   On information and belief, Green Mountain currently provides all or nearly all of the office K-Cup Brewers to "Office Coffee Services" customers (the "Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

111.   The Office Coffee Services Market Segment for Green Mountain is estimated to account for $175 million to $250 million worth of Green Mountain's

CLASS ACTION COMPLAINT

1    sales.

2        112.   Green Mountain's distributors are prohibited from selling Competitive

3    Cups to the Office Coffee Services Market Segment because doing so would

4    violate the Keurig Authorized Distributor (KAD) Agreement.

5        113.   Green Mountain has substantially foreclosed competitors like TreeHouse

6    from selling to the Office Coffee Services Market Segment through the use of

7    anticompetitive conduct including Green Mountain's extensive web of agreements,

8    such as the KAD Agreements.

9        114.   Green Mountain also enters into exclusionary agreements with office

10   specialty stores, such as Staples. For example, TreeHouse sought to supply

11   Compatible Cups to Staples, but Staples had an agreement with Green Mountain and

12   was thus unable to enter into a supply arrangement with TreeHouse.

13       115.   Green Mountain has admitted that it has more than 500 KADs,

14   which are contractually obligated to buy directly from Green Mountain and to only

15   sell products that are "authorized" by Green Mountain.

16       116.   Green Mountain maintains its monopoly power in the Away-From-

17   Home and Office Coffee Services Market Segments by leveraging its monopoly

18   over the Single-Serve Brewer Market in order to exclude competition from

19   Competitive Cups. Specifically, Green Mountain and its distributors agree to provide

20   K-Cup Brewers to commercial or office customers at little or no cost, provided those

21   customers agree to exclude Competitive Cup suppliers from this market segment by

22   purchasing Compatible Cups exclusively from Green Mountain.

23       **4.   Geographic Market**

24       117.   The relevant geographic market is the United States. To compete

25   effectively within the United States, Compatible Cup manufacturers and sellers need

26   distribution assets and relationships within the United States. Compatible Cup

27   manufacturers and sellers located outside of the United States that lack such assets

28   and relationships are unable to constrain the prices of Compatible Cup

CLASS ACTION COMPLAINT

manufacturers and sellers that have such domestic assets and relationships.

## INTERSTATE COMMERCE

118.   Defendants manufactured and/or sold Single-Serve Brewers, Portion Packs, and/or Compatible Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

119.   Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

120.   Green Mountain had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013. This number includes $3.187 billion in Portion Pack net sales and $827.6 million in Keurig Single-Serve Brewer and accessories net sales. Green Mountain had the top four best-selling coffeemakers by dollar volume in the United States at the end of its 2013 fiscal year.

## ADDITIONAL FACTUAL ALLEGATIONS

**A.    Green Mountain's Business Model Depends Upon Its Ability To Leverage Its Single-Serve Brewer Monopoly In Order To Restrain Competition and Extract Monopoly Profits From Its Monopoly Power In The Portion Pack and Compatible Cup Markets**

121.   Green Mountain's business model depends upon its ability to leverage its monopoly power in the Single-Serve Brewer Market in order to extract monopoly profits from the K-Cups it sells in the Portion Pack and Compatible Cup Markets. Specifically, this model relies on Green Mountain's ability to: (1) drive sales of Green Mountain's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (2) restrain price competition from Competitive Cups; and (3) maintain supracompetitive K-Cup prices for extended periods of time.

122.   As it admits in its own statements to the public and investors, Green Mountain sells K-Cup Brewers at cost or even a loss in order to saturate the market

with brewers that are only compatible with the K-Cup format, thereby locking consumers in to using the cup format instead of other types of portion packs.

123.   K-Cups account for the bulk of Green Mountain's profit margin, and Green Mountain's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.  While Green Mountain sacrifices its brewer profits to drive K-Cup sales, it recoups and exceeds its losses on brewer sales by charging a 50% margin on K-Cups.

124.   Green Mountain's monopoly leveraging strategy has created an enormous installed base of consumers for Green Mountain, which currently supplies at least 88% of the Single-Serve Brewers purchased by consumers for use at home, and on information and belief, 100% or close to 100% of K-Cup Brewers supplied to offices.

125.   Green Mountain likewise controls at least 86% of the Compatible Cup Market, based on Green Mountain estimates, which corresponds closely with its share of Single-Serve Brewers sold to consumers for home use.

126.   About 2.5 million cups are brewed in K-Cup Brewers every day in offices and homes in North America, and billions of cups have been brewed with K-Cup Brewers since K-Cups were created in 1998.

127.   As discussed further below, Green Mountain has protected its monopoly K-Cup profits and has exercised its power to exclude competition by entering into unreasonably restrictive agreements with companies at all levels that could otherwise do business with  other Compatible Cup makers.

**B.   Green Mountain Eliminates Competition and Exercises Its Monopoly Power By Raising Prices 10% To 15%**

128.   Keurig developed K-Cup Brewers and K-Cups in the late 1990s and obtained patents on those brewers as well as on the filters in K-Cups. For years thereafter, Keurig licensed various coffee company competitors, including KGM, to manufacture and sell filtered K-Cups.  After first partnering with Keurig in the late

CLASS ACTION COMPLAINT

1990s, KGM acquired Keurig and its patents in June 2006.  It then aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation (in 2009), Timothy's Coffees of the World, Inc. (in 2009), Diedrich Coffee, Inc. (in 2010), and LJVH Holdings, Inc. ("Van Houtte") (in 2010) – businesses for which it paid handsomely, according to one analyst.

129.   By August 2010, Green Mountain was ranked number 2 on Fortune's List of Global 100 Fastest-Growing Companies. When reporting the ranking, Green Mountain touted on August 19, 2010, that for "the first nine months of fiscal 2010, the company [had] produced net sales growth of 70% over the prior year and ... earnings per share growth of 89% over the same period for fiscal year 2009." ("Green Mountain Coffee Roasters, Inc. Ranks #2 on Fortune's List of Global 100 Fastest-Growing Companies," KGM press release (Waterbury, VT, August 9, 2010), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=500603 (last visited March 24, 2014)).

130.   Having grown into a billion-dollar publicly traded company by eliminating and restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that. On September 7, 2010, Green Mountain announced "a price increase" of "approximately 10 to 15 percent" on "all K-Cup portion packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels."  ("Green Mountain Coffee Roasters, Inc. Announces Price Increase," KGM press release (Waterbury, VT, September 7, 2010), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=505288 (last visited March 24, 2014)).

## C.    Competition Enters The Compatible Cup Market

131.   Although Green Mountain controlled 100% or close to 100% of the Compatible Cup Market in 2010, TreeHouse Foods Inc. apparently believed consumers would switch to Competitive Cups if they were offered at an attractive

CLASS ACTION COMPLAINT

price.

132.   Because Green Mountain owned K-Cup Filter Patents covering the use of filters in single-serve cups that had not yet expired as of 2010, starting in August, 2010 TreeHouse manufactured (through its Sturm subsidiary) Competitive Cups that did not contain filters.  It was the first competitor to challenge Defendants in the Compatible Cup market.

133.   As the expiration date of Green Mountain's K-Cup Filter Patents approached, Kroger Co., whose network of stores includes Ralphs, King Soopers, and Fred Meyer, announced plans on June 8, 2012 to offer store-branded, filtered Competitive Cups for use in Keurig brewers. Likewise, Safeway, Inc., announced on June 15, 2012 that it would introduce its own branded, filtered Competitive Cups for use in K-Cup Brewers, but at prices below Green Mountain's K-Cups.

134.   Green Mountain's K-Cup Filter Patents expired in September 2012.  Immediately upon expiration, TreeHouse augmented its non-filtered Competitive Cups with filtered versions, at prices lower than Defendants'.

135.   After Competitive Cups became available to consumers, the market suddenly "shifted". Brian Kelley explained, during the Green Mountain 2014 first quarter earnings call, that "we had a 100% of the system, and all of a sudden we have 86% of the system, [or] something like that." (Green Mountain FQ1 2014 Earnings Call Tr. at http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq  (last visited March 24, 2014)).

**D.    Green Mountain Retaliates Against TreeHouse by Filing A Sham Litigation and Appeal To Restrain Competition, Raise A Rival's Costs, And Intimidate Market Entrants**

136.   Within just a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse subsidiary Sturm, its strongest competitor, alleging in bad

CLASS ACTION COMPLAINT

faith that Sturm's Competitive Cups infringed Keurig's patents directed at *brewers* and methods of using *brewers — not even asserting any patents covering K-Cups themselves.* Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup *brewers* by using Sturm's unlicensed Competitive *Cups,* and that Sturm was thus also liable for 'inducing' infringement by these consumers.

137.   The lawsuit was baseless.  Its purpose was to harass, intimidate and drain the resources of the strongest competitor to Defendants in the Compatible Cups market.

138.   Sturm moved for and won summary judgment on the basis of noninfringement.

139.   In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit.

140.   The Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.,* 732 F.3d 1370, 1374 (Fed. Cir. 2013).

141.   The court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold', there is no restriction on [its] use to be implied for the benefit of the patentee." *Id.* (*quoting Quanta Computer, Inc. v. LG Elec., Inc.,* 553 U.S. 617, 630 (2008) (*quoting Adams v. Burke,* 84 U.S. 453, 457 (1873))).

142.   On information and belief, and as supported by the allegations in the Complaint and the meritless legal claims, Keurig instituted this lawsuit in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup

CLASS ACTION COMPLAINT

Market, to intimidate TreeHouse and other actual and potential market entrants, and to raise a rival's costs.

143.   Similarly, Keurig sued another early Compatible Cup Market entrant, Rogers Family Co., making similar claims. In Keurig's litigation against Rogers Family Co., a different federal district court likewise held on summary judgment that the Competitive Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

144.   As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.*

**E.    Green Mountain Restrains Competition With Anticompetitive Exclusive Agreements, Cuts Rivals Off From Inputs Needed To Compete, And Raises Rivals' Costs**

145.   Green Mountain has entered into unduly restrictive, anticompetitive, and exclusionary agreements with companies at multiple levels of the Compatible Cup distribution system, including makers of machinery used to make K-Cups; sellers of components such as foil tops; coffee companies; and distributors and retailers that sell K-Cups to end-user consumers, businesses, and institutions.

146.   This web of anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups. As parties to these agreements have admitted — Green Mountain does not restrict the ability to sell these same products for other purposes just so long as those products are not sold to a Green Mountain competitor who intends to use them to make Competitive Cups for use in K-Cup Brewers. Thus, these exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Green Mountain.

CLASS ACTION COMPLAINT

147.   Indeed, the web of exclusive dealing agreements Green Mountain has created allowed it to leverage its monopoly over the Single-Serve Brewer Market in order to maintain its monopoly over the Portion Pack and Compatible Cup Markets.

**F.    Green Mountain Unreasonably Restrains Access to Machines Needed To Make Compatible Cups in Competition With Green Mountain**

**1.    Direct Evidence Confirms That Green Mountain Exercises, Sustains, and Magnifies Its Monopoly Power By Coercing Suppliers To Exclude Competition**

148.   Before TreeHouse entered the Compatible Cup Market in 2010, it owned SpeeDee Holmatic machines that it had purchased from R.A. Jones & Co. ("R.A. Jones") to manufacture a commercial product that was not related to any type of brewer or Compatible Cup.

149.   At the time TreeHouse purchased the Spee-Dee Holmatic machines to produce this other product, R.A. Jones placed no restrictions on TreeHouse's ability to purchase such machinery.

150.   In order to enter the Compatible Cup Market, TreeHouse retrofitted the Spee-Dee Holmatic machines it had previously purchased from R.A. Jones in order to convert these production lines into machines that were capable of manufacturing non-filtered Compatible Cups.

151.   In 2013, in response to positive consumer feedback and increased demand for TreeHouse's non-filtered Competitive Cups following its entry into the Compatible Cup Market, TreeHouse sought to increase its capacity to produce a higher output of non-filtered Compatible Cups by purchasing another Spee-Dee Holmatic machine from R.A. Jones.

152.   TreeHouse requested a price quote for a new machine, but on December 19, 2013, a Sales Manager from R.A. Jones responded in an email, stating: "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."

CLASS ACTION COMPLAINT

153.   Under "the rules," as described by the representative, "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it." However, R.A. Jones can still "build equipment for all types of packages, just not k-cups or anything that goes into a Keurig brewer."

154.   The Sales Manager expressed hope that the Green Mountain "*agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business*" with TreeHouse. (emphasis added.)

155.   The December 19, 2013 R.A. Jones email, explaining that the "agreement" with Green Mountain prohibits R.A. Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer," provides direct evidence that Green Mountain coerces suppliers into entering into exclusionary agreements intended to restrain competition between Competitive Cup makers and Green Mountain. Because R.A. Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying machinery used to make Competitive Cups cannot be justified on the basis that it ensures a reliable supply when Green Mountain needs equipment. Instead, it is merely intended to cut off Competitive Cup makers' access to machinery that is necessary to compete with Green Mountain on a level playing field. This agreement, in and of itself, constitutes an unlawful conspiracy in restraint of trade and provides direct evidence that Green Mountain has exercised its monopoly power by excluding competitors from resources needed to compete with Green Mountain.

## 2.   Green Mountain Has Substantially Foreclosed Access To Machinery Used To Make Compatible Cups

156.   In the December 19, 2013 R.A. Jones email, the Sales Manager further noted that "[f]rom my own personal perspective, it's very frustrating because I feel that I'm alienating a great customer in Sturm Foods." He sympathized further, stating: "I can imagine this causes problems for Sturm, because you now have to

CLASS ACTION COMPLAINT

start over with another OEM. I can only offer my sincere apology."

157.   Indeed, R.A. Jones's refusal did cause problems for TreeHouse. TreeHouse searched for, but was unable to find, a single other supplier in the United States that was willing to sell it machinery used to make non-filtered Compatible Cups.

158.   Thus, on information and belief, by coercing R.A. Jones to enter into this anticompetitive and exclusionary agreement, Green Mountain substantially foreclosed competitors from the United States market for machinery used to make Compatible Cups.

### 3.   Green Mountain Unreasonably Restrains Access To Inputs Necessary to Make Compatible Cups In Competition With Green Mountain

159.   Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter. There are few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K-Cup Brewers and therefore cannot be purchased from suppliers "off the shelf."

160.   As set forth below, upon information and belief, Green Mountain entered into exclusive dealing agreements with suppliers of each K-Cup component to prevent competitors from purchasing these necessary inputs. Such agreements have restrained makers of Competitive Cups from being able to purchase Compatible Cup components, hampering their ability to bring competitive pressure to bear on Defendants.

### a.   Green Mountain Has Substantially Foreclosed Access to Domestic Suppliers of Plastic Cups Used To Make Compatible Cups

161.   Before 2010 when the first Competitive Cups entered the Compatible Cup market, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time

collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups.

162.   Each of these three component makers refused to sell to TreeHouse in its efforts to make and sell Competitive Cups.  On information and belief, the reason that each of these three cup makers refused TreeHouse's business was that all three were subject to  unduly restrictive, anticompetitive, and exclusionary agreements with Green Mountain.

**b.   Green Mountain Has Substantially Foreclosed Access to Domestic Suppliers of Lids Used to Make Compatible Cups**

163.   Similarly, there are few suppliers of the foil lid component of Compatible Cups: Winpak and LMI Packaging Solutions ("LMI").  When Competitive Cups first entered the market, Winpak and LMI collectively accounted for all or nearly all of the share of the market for the sale of foil lids components used to make K-Cups.

164.   As with the cup suppliers (*see* ¶¶ 161-62, *supra*), TreeHouse was rebuffed by both lid suppliers because of unduly restrictive, anticompetitive, and exclusionary agreements with Green Mountain.

**c.   Green Mountain Has Substantially Foreclosed Access to Domestic Suppliers of Filters Used To Make Compatible Cups**

165.   Since the expiration of the patent protection for filtered K-Cups, several filter makers have declined to sell to makers of Competitive Cups, on information and belief because those makers are subject to unduly restrictive, anticompetitive, and exclusionary agreements with Green Mountain.

166.   Green Mountain's restrictive agreements with the makers of components such as plastic cup, foil top and filter components have improperly limited competitors' ability to utilize the most experienced vendors and improperly imposed higher barriers to entry and additional costs and delays by forcing competing cup makers to re-invent the wheel and develop these components from scratch with new

CLASS ACTION COMPLAINT

and inexperienced vendors.    As a result, Defendants have been able to maintain anticompetitive charges to consumers.

**4.    Green Mountain Unreasonably Restrains Access To Roasters and Coffee Brands and Conspires to Allocate Markets, Exclude Competition, and Induce Competitive Cup Makers to Take an Anticompetitive License**

**a.    Green Mountain Enlists Competitor Co-Conspirators to Restrain Price Competition by Excluding Competitive Cup Makers**

167.    Over the years, Green Mountain has obtained trademark license and manufacturing agreements from numerous third parties to use their brand names on K-Cups. These companies include: Starbucks, Dunkin' Donuts, Caribou Coffee, Wolfgang Puck, and Newman's Own. Green Mountain currently owns or licenses some forty-nine coffee brands.

168.    Upon information and belief, many, if not all, of these agreements have multiyear terms and are exclusive, which prevents these brands from also licensing trademarks or entering into manufacturing agreements with makers of Competitive Cups.

169.    Upon information and belief, Green Mountain's agreements with coffee brands also contain restrictions dictating where and how the licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output. This creates a further incentive for licensed coffee brands to renew their agreements with Green Mountain and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Green Mountain, as demanded by Green Mountain as a precondition for selling Compatible Cups.

170.    These agreements specifically forbid coffee companies from selling coffee for inclusion in Competitive Cups: the coffee brands agree "not to sell coffee,

CLASS ACTION COMPLAINT

Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System." (*See, e.g.* Amended and Restated Purchase and License Agreement between Green Mountain and Caribou).

### b. Green Mountain Enters Into Contracts With Coffee Roasters That Unduly Restrict Competition From Competitive Cup Makers

171. Green Mountain also enters into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Green Mountain's own coffee as well as the coffee and tea that Green Mountain purchases from coffee brands.

172. In at least one such contract, Green Mountain subjected the roaster's ability to contract separately with Competitive Cup makers to Green Mountain's veto rights. Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such contract's compliance with the terms and conditions of this Agreement. Keurig shall review and either approve or disapprove such contracts ..." (*See* License and Distribution Agreement between Keurig, Incorporated and Diedrich Coffee, Inc. at §14.3, http://www.sec.gov/Archives/edgar/containers/fix048/947661/000119312508208074/dex1037.htm (last visited March 24, 2014)).

### c. Green Mountain Ties Up Distributors and Retailers with Unduly Restrictive and Anticompetitive Exclusive Agreements

173. Green Mountain distributes commercial K-Cup Brewers and accompanying K-Cups to the Away-From-Home Market Segment through over 500 Keurig Authorized Distributors (KADs), including Office Coffee Service operators, office suppliers such as WB Mason and United Stationers, hospitality

CLASS ACTION COMPLAINT

service providers, and food-service management companies, such as Vistar and Aramark.

174.   Green Mountain requires distributors to enter into a multi-year KAD Agreement, which prevents them from purchasing any and all Competitive Cups, thereby substantially foreclosing access to the Office Coffee Services Market Segment. Specifically, Green Mountain KAD Agreements contain a "Keurig Loyalty" requirement that prohibits distributors from promoting, marketing, or selling non-Keurig portion packs, brewers, or unapproved accessories for Keurig brewers.

175.   These KAD Agreements are unduly restrictive not only because they substantially exclude competition, but also because they do so for a multi-year period.

176.   The terms of these agreements are the result of Green Mountain's exercise of its monopoly over the Single-Serve Brewer Market to coerce distributors into unfavorable and exclusionary agreements, which protect Defendants' anticompetitive premium.

**G.   Green Mountain Plans To Eliminate Competition By Technologically Tying K-Cup Purchases To K-Cup Brewer Purchases To Lock Out Competitive Cups**

177.   In November 2013, in the wake of increased competition from TreeHouse and other Competitive Cups following the expiration of Green Mountain's K-Cup Filter Patents, Green Mountain announced that it would "launch a new lineup" of 2.0 K-Cup Brewers over the next twelve months with an anticipated release date in Fall 2014.

178.   Green Mountain now seeks to impose an exclusionary technological barrier to prevent consumers and commercial customers that use a K-Cup Brewer from using Competitive Cups and to coerce retailers into replacing low-priced Competitive Cups with K-Cups.

179.   As explained by Green Mountain's CEO, Brian Kelley, "the [2.0 K-Cup

CLASS ACTION COMPLAINT

Brewer] will not brew unlicensed packs" because of a new "interactive technology" intended to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew." Brian Kelley, Green Mountain Q4 2013 Earnings Call, Transcript at 4-5 (Nov. 20, 2013).

180.   Thus, as one analyst explained, KGM "has decided to 'close' the system with its new reader technology, meaning that the new brewers will not brew unlicensed packs."

181.   Rather than a true technological innovation, Green Mountain's announced "new" technology threatens to eliminate competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups. By tying 2.0 K-Cup purchases to the purchases of the 2.0 K-Cup Brewers, Green Mountain intends to leverage its monopoly over the Single-Serve Brewer Market in order to exclude competition in the Compatible Cup Market.

182.   This is yet another attempted "end-run" around the patent and competition laws. While Green Mountain could lower K-Cup prices and their 50% K-Cup profit margins to compete on the merits, Green Mountain instead announced a new anticompetitive plan to lock out what it describes as "the many strong [Competitive Cup] brands that are unlicensed" from 2.0 K-Cup Brewers.

183.   The 2.0 K-Cup Brewer will reportedly work with a special taggant ink built into the lid of Green Mountain-owned or licensed 2.0 K-Cups, which will be read by "interactive technology" in the 2.0 K-Cup Brewer in order to identify whether the user has inserted a 2.0 K-Cup that is owned or licensed by Green Mountain or a Competitive Cup.

### 1.   Green Mountain Has Announced That It Will Eliminate K-Cup Brewers That Work With Competitive Cups

184.   During the November 2013 financial analyst call, Mr. Kelley stated that

CLASS ACTION COMPLAINT

Green Mountain "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early 2015."  (*TreeHouse* Complaint at ¶ 250.)

185.  Mr. Kelley reiterated Green Mountain's plan to eliminate alternative K-Cup Brewers during the investor call on February 5, 2014. When asked if the 2.0 K-Cup Brewers would "have a more narrow retail footprint," as "retailers [ ] might not carry it [2.0 K-Cup Brewers], because it might not support their private label brand," Mr. Kelley responded in part that "[t]his [2.0 K-Cup Brewer] will be the Keurig system and so it's replacing the current Keurig system that's out there. And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry."

186.  By eliminating the K-Cup Brewers that work with Competitive Cups and replacing them with brewers that lock out Competitive Cups, Green Mountain seeks to exercise its monopoly power to exclude competition and to maintain supracompetitive K-Cup prices by forcing consumers to give up the Competitive Cups they prefer to use.

187.  Brokerage and investment firm Stifel agrees that Green Mountain's "re-closing ... is primarily driven by share gains from unlicensed brands since patent expiration," rather than an interest in benefitting consumers.  (Mark S. Astrachan and Edward McPike, "Investor Meeting Takeaways," Stifel, September 11, 2013, at p. 2).

188.  Bank of America has similarly observed that "the new Keurig platform [] not brew[ing] unlicensed portion packs ... is the strongest action management has taken to strengthen the moat around its profit pool," noting further that their "impression was that management felt a sense of urgency to [] protect its market share (and profits) from the incursion of unlicensed portion pack competitors ..." (*TreeHouse* Complaint at ¶ 250).

189.  As industry news editor, Keith Nunes, explains, "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share." ("G.M.C.R. playing hardball with Keurig 2.0," Food Business News (November 21,

CLASS ACTION COMPLAINT

2013) http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/ 11/GMCR_playing_hardball_with_Keu.aspx?ID={58DC5419-F51B-486C-8328-64CD811AFC81}&cck=1(last visited March 24, 2014)).

190.   Accordingly, Mr. Kelley "expect[s] [the] unlicensed [Competitive Cup] share of the system to begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer. (http://www.morningstar.com/earnings/PrintTranscript.aspx?id=60483466     (last visited March 24, 2014)).

## 2.   Green Mountain's Lock-Out Strategy Is Intended To Coerce Competitive Cup Makers To Enter Agreements Restricting Competition

191.   Brian Kelley stated during the November 20, 2013 investor call that Green Mountain "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert as many [Competitive Cup makers] as [it] can."

192.   Stifel has explained that Green Mountain views its "introduction of Keurig 2.0 as an opportunity to convert unlicensed [Competitive Cup makers] to licensed partners." It further observed that "Green Mountain is pushing retailers on the need to become a licensed partner before the system closes to prevent losing consumer relevance."

193.   In order to become an "authorized" or "licensed" "Keurig system partner," however, on information and belief, Green Mountain demands that its purported "licensees" cede their independent decision-making authority to Green Mountain as to where and how many Competitive Cups can be sold by the "licensee." Such agreements have the effect of allocating markets, restraining output, and allowing Green Mountain to maintain supracompetitive prices.

194.   On information and belief, Green Mountain additionally demands a

CLASS ACTION COMPLAINT

royalty payment or other consideration under the purported "license," despite the fact that its K-Cup Filter Patents expired over a year ago. Such monopoly rents have the effect of raising rivals' costs, increasing prices, and restraining free and fair competition on the merits.

195.   Green Mountain has been further using the upcoming 2.0 K-Cup Brewer launch to coerce Competitive Cup makers to enter into anticompetitive agreements with Green Mountain by enlisting the help of Competitive Cup makers' retail customers. Specifically, Green Mountain has been contacting retailers to inform them that the Competitive Cups they have been purchasing will not work in 2.0 K-Cup Brewers and then inducing those retailers to urge their supplier of Competitive Cups to contact Green Mountain to become an "authorized" or "licensed" partner.

196.   To date, Green Mountain has failed plausibly to substantiate its claim that locking Competitive Cups out of 2.0 K-Cup Brewers would benefit consumers. Not only is there no consumer benefit to be gained by locking Competitive Cups out of the market, but the lock-out would actually harm consumers.  Vague promises of improved performance by Defendants thus far are transparently a sham.  Market reaction to similar cup-recognition technology in single-serve brewers has been significantly negative; consumers do not like the idea, and its real purpose is to allow the Defendants to thwart competition.

**3.      Green Mountain Has Undermined Its Own Pretextual Pro-Competitive Justifications**

197.   Green Mountain has admitted that it could turn on or off this lock-out technology after a certain number of uses, such that any purported claim that the K-Cup Brewers and the K-Cups necessarily constitute a system is pretextual.

198.   As of October 2013, Mr. Kelley admitted it was "fair to say [Green Mountain] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times

CLASS ACTION COMPLAINT

before they no longer work," reported by USA Today. *See* Dan D'Ambrosio, With K-Cup Patent Expired, Others Try To Cash In, USA Today (October 29, 2013). Green Mountain therefore cannot plausibly assert that this lock-out technology, which could be programmed to be switched on or off or to work only a limited number of times, is in any way integral to any purported consumer benefit or a necessary aspect of any unified "system."

199.   Moreover, K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demand to purchase Compatible Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or internet retailers, in different locations, at different times, and under different promotions.

200.   Further, Green Mountain has successfully raised K-Cup prices above supracompetitive levels for extended periods of time without losing market share of its K-Cup Brewers, thereby demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.   Indeed, Green Mountain's sales of K-Cup Brewers have experienced a high rate of growth, year after year, every year since Green Mountain increased its prices in 2010.

**4.      Green Mountain Has Also Used Its Planned Lockout To Intimidate Retailers Into Refusing To Sell Competitive Cups**

201.   Green Mountain has been systematically confronting retailers with statements of its purported Keurig 2.0 product design and present intent and plan to lock out Competitive Cups, attempting to dissuade those retailers from doing business with makers of Competitive Cups.

**5.      Restraints on Price Competition Have Caused Supracompetitive Prices Harming Consumers, Commercial Customers, Retailers, and Distributors**

202.   With little to no competition, depending on the line of business, Green Mountain and its owned or licensed coffee brands have been able to charge

CLASS ACTION COMPLAINT

supracompetitive prices for K-Cups. As a result, consumers and commercial customers in both the Away-From-Home and At-Home Market Segments have been forced to pay at least 15% to 25% more for Green Mountain-owned and licensed K-Cups than they would have for Competitive Cups. Indeed, a consumer or commercial customer pays on average $0.60 for a Green Mountain K-Cup, as opposed to $0.45 for a Competitive Cup. *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28.

203.   The average K-Cup Brewer owner, moreover, uses more than 1,000 K-Cups per year, according to estimates. At an estimated 60 cents per K-Cup, that translates into an expense of over $600 per year for the average K-Cup user.

204.   Competitive Cups are substantially less expensive, which can save consumers over $150 a year (assuming the same 1,000-cup per year consumption rate).

205.   Consumers and commercial customers do not willingly choose to pay supracompetitive prices for Green Mountain-owned and licensed K-Cups. On the contrary, market studies show that "Keurig users remain highly price sensitive and willing to try new K-Cup brands if they are less expensive."   (*TreeHouse* Complaint at ¶ 291).   In fact, "90.9% of Keurig users replied that they would try a new K-Cup brand if it were less expensive. This is more supportive evidence that K-Cup users would not necessarily be loyal to a particular brand if they found a more inexpensive option." (*Id.*)

206.   By restraining price competition and the availability of Competitive Cups, Green Mountain has also harmed retailers, grocers, and distributors, which seek to reduce prices in order to increase sales and win business away from competitors with higher prices or fewer brands.

///

///

///

CLASS ACTION COMPLAINT

- 42 -

1
2
3
4

**6.     Restraints On Competition Have Reduced Output And Availability of Preferred Brands, Thereby Harming Suppliers, Competitive Cup Makers, Retailers, Distributors, Commercial Customers, and Consumers**

5
6
7
8
9
10
11

207.   Green Mountain's conduct has also limited the number and variety of Compatible Cup beverages available to consumers and commercial customers. By foreclosing access to markets, inputs, suppliers, distributors, and brands, Green Mountain has limited the output, distribution, and availability of Competitive Cups. As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by Competitive Cup manufacturers.

12
13
14
15

208.   Consumer choice has been limited because competitors disadvantaged by Green Mountain's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Competitive Cups.

16
17
18

209.   Green Mountain has further constrained Competitive Cup output and diversity by foreclosing access to lucrative licensing and manufacturing arrangements with most well-known coffee brands, such as Starbucks and Dunkin' Donuts.

19
20

**7.     Green Mountain Has Substantially Foreclosed Access To The Office Coffee Services Market Segment**

21
22
23
24
25
26

210.   Because Green Mountain is currently, on information and belief, the only provider of K-Cup Brewers in the Office Coffee Services Market Segment and has prohibited distributors from selling Competitive Cups, competition in this market has been substantially foreclosed. TreeHouse, other Competitive Cup manufacturers, and other potential entrants have been substantially foreclosed from competing for this business.

27
28

211.   Distributors serving the Office Coffee Services Market Segment have also been deprived of competition for their services and the opportunity to bargain for their

CLASS ACTION COMPLAINT

preferred sales terms, despite their expressed interest in doing business with multiple Compatible Cup manufacturers.

212.   Instead, distributors have been forced to do business with Green Mountain alone on a take-it-or-leave-it basis, and distributors and commercial customers have had to accept Green Mountain's unfavorable delivery and packaging terms.

213.   By eliminating the freedom to do business with Competitive Cup manufacturers, distributors have also been harmed because they cannot compete based on the brands that they carry, which also harms consumers who are deprived of their preferred Compatible Cup selections.

214.   Green Mountain's Office Coffee Services customers, on information and belief, have expressed that they would prefer to purchase Competitive Cups from TreeHouse, but are precluded from doing so because Green Mountain has locked in all distributors and has substantially foreclosed access to Competitive Cups.

## **PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY**

215.   Defendants' anticompetitive conduct had the following effects, among others:

    a.   Price competition has been restrained or eliminated with respect to K-Cups sold in the United States;

    b.   The prices of K-Cups sold in the United States have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    c.   Indirect purchasers of K-Cups have been deprived of free and open competition; and

    d.   Indirect purchasers of K-Cups paid artificially inflated prices.

216.   By reason of the alleged violations of the antitrust laws and other laws alleged herein, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for K-Cups than they would have

CLASS ACTION COMPLAINT

1  paid in the absence of the Defendants' illegal conduct, and, as a result, have suffered
2  damages in an amount presently undetermined. This is an antitrust injury of the type
3  that the antitrust laws were meant to punish and prevent.

**CAUSES OF ACTION**
**COUNT ONE**
**Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

217.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

218.   As detailed above, Green Mountain has monopoly power in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

219.   As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

220.   Green Mountain has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

    a.  coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, unreasonably restrain competition, exclude competitors, limit output, and raise competitors' costs;

    b.  conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

    c.  coercing distributors and retailers to enter into anticompetitive agreements that restrain market entry, exclude competitors, unreasonably restrain competition, and limit output;

    d.  filing an objectively and subjectively baseless litigation and appeal

CLASS ACTION COMPLAINT
- 45 -

against TreeHouse subsidiary Sturm for the purpose of interfering with TreeHouse's ability to compete in the Compatible Cup market;

e. announcing an anticipated tie of the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competitive Cup makers;

f. threatening to unreasonably restrain competition through the implementation of an anticompetitive product redesign with lock-out technology that cannot be justified based on any legitimate, non-pretextual consumer benefit, which is coupled with the elimination of K-Cup Brewers that are compatible with Competitive Cups; and

g. raising rivals' costs above those that would exist under competitive conditions by coercing Competitive Cup makers to enter purported "licenses" that restrict output and raise rivals' costs by requiring the payment of improper "royalty" payments.

221.   While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

222.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

## <u>COUNT TWO</u>
### Exclusive Dealing
### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and Section 3 of The Clayton Act, 15 U.S.C. § 14

223.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

224.   As detailed above, Green Mountain has monopoly power in the Single-

CLASS ACTION COMPLAINT

Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

225. Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

226. These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

227. This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers. Thus, Green Mountain's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

228. This conduct has substantially foreclosed competition in the Portion Pack and Compatible Cup Markets.

229. This conduct has also substantially foreclosed access to machinery used to manufacture non-filtered Compatible Cups and competition for sales of Compatible Cups to the Office Coffee Services Market Segment.

230. Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton Act. Additionally, these exclusionary agreements violate Section 2 of the Sherman Act, 15 U.S.C. § 2 because these agreements are intended to maintain KGM's monopolies over the relevant markets.

231. As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury.

CLASS ACTION COMPLAINT

Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

**COUNT THREE**
**Monopoly Leveraging**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

232. Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

233. As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

234. Green Mountain has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets, specifically, by selling K-Cup Brewers at or below cost in order to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Green Mountain's competitors in the Compatible Cup Market.

235. Green Mountain further threatens to continue to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, lock-out technology that cannot be justified on the basis of any legitimate consumer benefit.

236. Green Mountain willfully acquired monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.

237. Green Mountain's leveraging of its monopoly power violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

238. As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury.

CLASS ACTION COMPLAINT

Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

## COUNT FOUR
### Technological Tying
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### and Section 3 of The Clayton Act, 15 U.S.C. § 14

239. Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

240. With the introduction of the 2.0 K-Cup Brewers, which Green Mountain asserts will only be compatible with 2.0 K-Cups, Green Mountain threatens to tie 2.0 K-Cup purchases to the purchase of 2.0 K-Cup Brewers. By willfully and intentionally imposing a technological tie between the 2.0 K-Cup Brewers and 2.0 K-Cups, Green Mountain will condition the use of the 2.0 K-Cup Brewers on a consumer's purchase of 2.0 K-Cups. 2.0 K-Cup Brewer consumers will be forced to forgo purchasing Competitive Cups, since those cups will purportedly be rendered incompatible with 2.0 K-Cup Brewers.

241. Green Mountain's tying arrangement will affect a substantial volume of interstate commerce.

242. Green Mountain's tying arrangement will have the effect of: (i) inhibiting or preventing the sale of Competitive Cups; (ii) decreasing research and investment by Competitive Cup makers in the Portion Pack and Compatible Cup Markets; (iii) discouraging or preventing new entry into the Compatible Cup Market; (iv) maintaining supracompetitive K-Cup prices and increasing average prices of Compatible Cup prices overall to consumers; (v) exploiting purchasers of 2.0 K-Cup Brewers by blocking their use of Competitive Cups of their preference; (vi) allowing Green Mountain to coerce competitors and third parties to take licenses from, and pay royalties to, Green Mountain; and (vii) increasing Green Mountain's share and monopoly power over the Compatible Cup Market.

243. The anticompetitive effects of Green Mountain's conduct outweigh any procompetitive benefits; indeed, there are little or no

CLASS ACTION COMPLAINT

procompetitive benefits resulting from Green Mountain's threatened lock-out of Competitive Cups through means of a technological tie; and/or such pro-competitive justifications as can be articulated are mere shams.

244.   Green Mountain's tying arrangement is intended to maintain and increase its monopoly power, or dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets.

245.   Green Mountain's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 3 of the Clayton Act.

246. As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

## COUNT FIVE
### Anticompetitive Product Redesign
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

247.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

248.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

249.   As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

250.   Green Mountain has further threatened to willfully and intentionally exclude competition from the Portion Pack and Compatible Cup Markets through the use of anticompetitive and exclusionary interactive lock-out technology intended to render Competitive Cups incompatible with 2.0 K-Cup Brewers.

CLASS ACTION COMPLAINT

251.   Green Mountain has threatened to eliminate alternative brewers by replacing prior generations of K-Cup Brewers with 2.0 K-Cup Brewers, thereby locking in consumers and forcing them to use K-Cups exclusively.

252.   On information and belief, the "interactive technology" will not materially benefit consumers, and, in fact, will harm consumers by resulting in reduced availability of preferred brands. Any purported consumer benefit asserted by Green Mountain for this lock-out technology is a pretextual sham, which, on information and belief, is intended to disguise Green Mountain's anticompetitive intent to exclude competition and maintain and increase its monopoly over the Portion Pack and Compatible Cup Markets.

253.   Green Mountain seeks to force Competitive Cup makers to take a purported "license" from, and to pay illegitimate royalties to, Green Mountain in order to avoid the exclusionary effects of this "interactive technology."

254.   Green Mountain also seeks to leverage the threat of the exclusionary effects of "interactive technology" to cause entities to stop dealing with Green Mountain's competitors.

255.   Green Mountain's conduct violates Section 2 of the Sherman Act.

256.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

## COUNT SIX
### Attempted Monopolization in the Alternative
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

257.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

258.   As detailed above, Green Mountain has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Portion Pack

CLASS ACTION COMPLAINT

and Compatible Cup Markets, including the power to control prices and exclude competition.

259.   Green Mountain has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

260.   Green Mountain's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Pack and Compatible Cup Markets. Green Mountain's anticompetitive conduct presents a dangerous probability that Green Mountain will succeed, to the extent it has not already, in its attempt to monopolize the Portion Pack and Compatible Cup Markets.

261.   Green Mountain's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

262.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

## COUNT SEVEN
### Conspiracy to Monopolize
### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2

263.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

264.   As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack Market, and Compatible Cup Market, including the power to control prices and exclude competition.

265.   Green Mountain willfully and intentionally conspired with competitor roasters and coffee brands to monopolize the Portion Pack and Compatible Cup Markets.

CLASS ACTION COMPLAINT

266.   Green Mountain and its licensees accomplished this by entering into multi-year, exclusionary agreements which prevent competitor roasters or coffee brands from licensing trademarks or entering into agreements with Green Mountain's competitors.

267.   Co-conspirators entered into these agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations, thereby restraining the ability of Competitive Cup makers to enter into contracts with distributors or other resellers.

268.   These restrictions regarding where and how K-Cups can be sold also allow Green Mountain to maintain supracompetitive prices across licensed brands by controlling output, which reduces the competitor roaster or coffee brands' incentives to enter into deals with Competitive Cup makers and creates an economic incentive for these co-conspirators to restrain competition from Competitive Cup makers and to induce Competitive Cup makers to enter into "license" agreements with Green Mountain that would require the Competitive Cup maker to permit Green Mountain to allocate the markets for Competitive Cups and to raise rivals' costs through the payment of an illegitimate "royalty."

269.   Green Mountain and its licensees' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from Competitive Cup makers in order to restrain price competition in the Portion Pack and Compatible Cup Markets.

270.   Green Mountain's conduct violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

271.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and the Class seek injunctive and equitable relief.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT EIGHT
### Violation of Section 16720 of the California Business and Professions Code ("The Cartwright Act")

272.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

273.   The violations of federal antitrust law set forth above also constitute violations of section 16720 of the California Business and Professions Code.

274.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of California Business and Professions Code §§ 16700 *et seq*.

275.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of California Business and Professions Code §§ 16700 *et seq*.

276.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for K-Cups than they otherwise would have paid in the absence of Defendants' unlawful conduct.   As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## COUNT NINE
### Violations of California Business and Professions Code §§ 17200 *et seq*.

277.   Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs.

278.   The violations of federal antitrust law set forth above also constitute violations of section 17200 *et seq*. of the California Business and Professions Code,

CLASS ACTION COMPLAINT

1    also known as the Unfair Competition Law (or "UCL").

2        279.   Defendants have engaged in unfair competition or unfair,

3    unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by

4    engaging in the acts and practices specified above.

5        280.   This claim is instituted pursuant to sections 17203 and 17204 of the

6    California Business and Professions Code, to obtain restitution from these

7    Defendants for acts, as alleged herein, that violated the UCL.

8        281.   The Defendants' conduct as alleged herein violated the UCL. The acts,

9    omissions, misrepresentations, practices and non-disclosures of Defendants, as

10   alleged herein, constituted a common, continuous, and continuing course of conduct

11   of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or

12   practices within the meaning of the UCL, including, but not limited to, the following:

13   (1) the violations of Sections 1 and 2 of the Sherman Act, as set forth above; and (2)

14   the violations of Section 16720, *et seq.*, of the California Business and Professions

15   Code, set forth above.

16       282.   Defendants' acts, omissions, misrepresentations, practices, and non-

17   disclosures, as described above, whether or not in violation of Section 16720, *et seq.*,

18   of the California Business and Professions Code, and whether or not concerted or

19   independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

20       283.   Plaintiffs and members of the Class are entitled to full restitution and/or

21   disgorgement of all revenues, earnings, profits, compensation, and benefits that may

22   have been obtained by Defendants as a result of such business acts or practices.

23       284.   The illegal conduct alleged herein is continuing and there is no

24   indication that Defendants will not continue such activity into the future.

25       285.   The unlawful and unfair business practices of Defendants, and each of

26   them, as described above, have caused and continue to cause Plaintiffs and the

27   members of the Class to pay supra-competitive and artificially-inflated prices for K-

28   Cups sold in the State of California. Plaintiffs and the members of the Class suffered

CLASS ACTION COMPLAINT

injury in fact and lost money or property as a result of such unfair competition.

286.   As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

### PRAYER FOR RELIEF

Accordingly, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2)-(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.   That the unlawful conduct alleged herein be adjudged and decreed in violation of Sections 1 and 2 of the Sherman Act; Section 3 of the Clayton Act; Section 16720 of the California Business and Professions Code; California Business and Professions Code §§ 17200, *et seq.*;

C.   Plaintiffs and the members of the Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of such Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.   Plaintiffs and the members of the Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons

CLASS ACTION COMPLAINT

acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.     Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.     Plaintiffs and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs, on behalf of themselves and the Class of all others similarly situated, hereby demand a trial by jury on all issues so triable.


Respectfully Submitted,

Dated:  March 24, 2014

By:  /s/ Rachele R. Rickert
        rickert@whafh.com

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
gregorek@whafh.com
BETSY C. MANIFOLD
manifold@whafh.com
RACHELE R. RICKERT
rickert@whafh.com
MARISA C. LIVESAY
livesay@whafh.com
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile:  619/234-4599

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
FRED TAYLOR ISQUITH
isquith@whafh.com
THEODORE B. BELL
tbell@whafh.com
CARL MALMSTROM
malmstrom@whafh.com
55 West Monroe Street, Suite 1111
Chicago, IL 60603
Telephone: 312/984-0000
Facsimile:   312/984-0001

Attorneys for Plaintiffs

20614/KEURIG

CLASS ACTION COMPLAINT

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SHIRLEY SCHROEDER and CONSTANCE WERTHE, On Their Own Behalves And On Behalf Of All Others Similarly Situated,

**DEFENDANTS**

KEURIG GREEN MOUNTAIN, INC. and KEURIG, INC.

**(b)** County of Residence of First Listed Plaintiff    San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

RACHELE R. RICKERT
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
750 B Street, Suite 2770, San Diego, CA 92101, 619/239 4599

Attorneys *(If Known)*

**'14CV0678 DMS KSC**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. section 1

Brief description of cause:
Violation of Federal Antitrust Laws and California Unfair Competition Laws

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
03/24/2014

SIGNATURE OF ATTORNEY OF RECORD
/s/ RACHELE R. RICKERT

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    **(b)**    **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    **(c)**    **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**    **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.